TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00310-CV






Roland D. Fortenberry, Jr., a/k/a Dale Fortenberry, Jr. and Kaye Ann Fortenberry,
Appellants


v.


Gerald R. Cavanaugh, Jr. and Dianna Cavanaugh, individually and as Shareholders in the
right of Fortune Products, Inc., a Texas Corporation, Appellees







FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT

NO. 30599, HONORABLE PAUL DAVIS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 This appeal arises from a dispute over the control of the management of
Fortune Products, Inc., a family-owned business in Marble Falls. Appellants Roland D. Fortenberry
a/k/a Dale Fortenberry, Jr., and Kaye Ann Fortenberry appeal the jury's verdict and
the district court's judgment in favor of appellees Gerald R. "Jay" Cavanaugh, Jr., and
Dianna Cavanaugh. 

 In five issues, the Fortenberrys contend that (i) the trial court erred by awarding the
Cavanaughs attorney's fees and costs; (ii) the evidence is legally or, alternatively, factually
insufficient to support the judgment in favor of the Cavanaughs' claim for declaratory judgment and,
as a matter of law, the Fortenberrys are entitled to declaratory judgment and attorney's fees;
(iii) questions to the jury were erroneous, caused the rendition of an improper verdict, and cannot
provide a basis for the judgment; (iv) the evidence is legally or, alternatively, factually insufficient
to support the appointment of a receiver; and (v) the contempt order exceeds the district court's
statutory authority. For the reasons that follow, we affirm the district court's judgment. (1) 


FACTUAL AND PROCEDURAL BACKGROUND


Background of the Company

 Fortune Products, Inc., was created in 1984. It manufactures and sells knife
sharpeners. From its inception in 1984 to 2000, Dale Fortenberry, Sr., was the majority shareholder,
a director, and held the positions of president and chairman of the board. His wife,
Betty Fortenberry, was a director and held the positions of secretary and treasurer. Their
two children, Dale Fortenberry, Jr., (2) and Dianna Cavanaugh, also worked in the business. In 1990,
Fortenberry, Sr., and Betty Fortenberry, as directors, promoted Fortenberry to the position of
vice president. 

 Effective January 1, 2000, Gerald R. "Jay" Cavanaugh, their daughter's husband, was
hired "in the capacity of Vice President of Finance and Administration . . . in charge of all
accounting functions as well as production and plant maintenance." At the same time, Fortenberry's
title changed to Vice President of Sales and Marketing. Both Fortenberry and Cavanaugh reported
to Fortenberry, Sr., and they both had supervisory responsibility of other employees.

 In the summer of 2000, Fortenberry, Sr., was diagnosed with cancer. Although the
parties dispute when the decision was made for the two sides of the family to purchase the shares
of the company, the record reflects Fortenberry, Sr., sold the company's outstanding shares on
August 1, 2000, equally to the Fortenberrys and the Cavanaughs. (3) Also on August 1, 2000, the
shareholders and directors held a special meeting. Fortenberry, Sr., and Betty Fortenberry resigned
as directors and officers of the company, and Fortenberry, Mrs. Fortenberry, Cavanaugh, and
Mrs. Cavanaugh were elected directors. The directors elected Cavanaugh as chairman of the board
and vice president, Fortenberry as president, and Mrs. Cavanaugh as the secretary and the treasurer. 
The shareholders also amended the shareholders agreement to require the shareholders to elect
themselves as the four directors. Shortly after the sale, Betty Fortenberry died, and Fortenberry, Sr.,
died in June 2001.


The Controversy


 The shareholders and directors held annual meetings in October 2000, 2001, and
2002, re-electing the same officers and directors. The October 2003 annual meeting, however, ended
without the re-election of directors and officers, and the parties have feuded over the day-to-day
management of the company since at least that time. 

 By letter dated June 28, 2004, Fortenberry advised Cavanaugh that he was
discontinuing Cavanaugh's "participation in the day-to-day operations of the company":

 

 This letter is to inform you of changes I am implementing with respect to the
day-to-day operations of the corporation. The morale of the company has suffered
as a result of your interaction with the employees. . . . Therefore, in order to protect
the company's profitability and to continue to enhance shareholder value, I am
exercising my authority to discontinue your participation in the day-to-day operations
of the company.


 Section 5.09 of Fortune Products Inc.'s bylaws identifies the President as the
chief executive officer of the corporation, and gives him the authority to make
decisions regarding the general and active management of the corporation's business. 
The action that I am taking is in no way intended to remove you from your position
as Vice President, but to change your duties with respect to day-to-day operations. 
As you know, your role in the operation of the corporation was always intended to
certain financial matters. Your participation in the operations of the company is
specifically subject to my authority to delegate those duties to other officers of the
corporation as outlined in the bylaws and as deemed in the best interests of the
company and its shareholders. Because of the unquestionable downward trend in
company morale and productivity, I am now exercising my authority to exclusively
oversee the company's day-to-day operations. While I appreciate your previous
assistance, you will no longer provide any management or personnel supervision and
you will no longer office on the premises of the company.


 As I previously noted, this action does not alter your position as Vice
President nor is it intended to discontinue your salary; that authority rests solely with
the board of directors. This action is taken pursuant to my duty to enhance
shareholder value and is specifically authorized by the corporation's bylaws, which
grant the President the authority to actively manage the company's daily operations. 
I trust that you will recognize that I am exercising my authority in the best interests
of all of the company's shareholders, including you.


 You will be expected to monitor the company's investment accounts as you
have historically done, and to provide input on financial statements and transactions
as specifically requested by me and/or the Board of Directors. Should you need
additional computer equipment to perform these duties from your home, the
Company will make available equipment reasonably necessary to performing your
duties.


 In order to provide further clarity, you are not to direct or supervise the
activities or duties of any company employees, nor are you to contact any of the
company's salesmen, distributors or customers. Any violation of these instructions
will require action, judicial or otherwise, necessary to insure compliance. While you
may retain the corporate American Express card, only reasonable and necessary
corporate expenses incurred in the performance of these specified duties will be
accepted.



Litigation Commenced

 On June 29, 2004, Fortenberry filed a declaratory judgment action in Travis County
against Cavanaugh to determine Fortenberry's authority regarding management of the company,
including his authority to prescribe Cavanaugh's duties. Fortenberry obtained a temporary
restraining order barring Cavanaugh from his office at the company. The next day, June 30, the
Cavanaughs filed suit in Burnet County against Fortenberry and Fortune Products, seeking a
declaratory judgment to determine the respective rights of the parties. The Burnet County action also
asserted claims for an accounting and the appointment of a receiver, for monetary damages, and for
injunctive relief. The Cavanaughs obtained a temporary restraining order against Fortenberry, and,
after a hearing in July, a temporary injunction against him. 

 The temporary injunction against Fortenberry remained in effect pending the trial on
the merits. The injunction enjoined Fortenberry from, among other things, entering into any contract
or agreement except as authorized by the court or the company's board of directors, making
withdrawals from any checking or savings account of Fortune Products except for "reasonable,
necessary, ordinary and routine business expenses," incurring any indebtedness in the name of
Fortune Products except for "reasonable, necessary, ordinary and routine business expenses,"
excluding the Cavanaughs from the office or other facilities of Fortune Products, opening or
diverting mail addressed to the Cavanaughs, or engaging in any other acts to hinder or prevent the
Cavanaughs from exercising their rights and authority or from performing their duties as officers of
the company. The Cavanaughs filed numerous motions for contempt alleging continuing violations
of the injunction by Fortenberry, and there were numerous contempt hearings during the
pendency of the case. 

 After hearings on various matters in Burnet County, including a motion to appoint
a receiver, and an unsuccessful mediation, the district court in November 2004 appointed
Burl Harper, who had been the company's accountant since approximately 1997, to serve as a
receiver for the company. Fortenberry and Fortune Products appealed the receivership to this Court,
and this Court reversed it in June 2005, holding that the "district court abused its
discretion in prematurely ordering the appointment of a receiver with sweeping powers." See
Fortenberry v. Cavanaugh, No. 03-04-00816-CV, 2005 Tex. App. LEXIS 4665, at *10
(Tex. App.--Austin 2005, no pet.). 

 The litigation continued with the Travis County case being transferred and
consolidated with the Burnet County case in September 2005. In January 2006, the district court
ruled on competing motions for partial summary judgment on the parties' respective declaratory
claims, granting both motions in part and denying both motions in part. The court granted the
Cavanaughs' proposed declaration 2 as to the "inherent" powers of the president and their proposed
declarations 5, 8, and 9:


 (2) Defendant Fortenberry has no inherent powers by virtue of his office as
President to bind Fortune Products, except as to routine matters arising in the
ordinary course of business; . . . 


 (5) Defendant Fortenberry has no power or authority to set, increase, reduce or
discontinue the wages or salary of any officer or employee of Fortune
Products, except as authorized by the Board of Directors of Fortune
Products; . . . 


 (8) Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as
Vice President, is authorized, in the absence or disability of the President, to
perform the duties and have the authority and exercise the powers of the
President; 


 (9) Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as
Vice President, shall perform such other duties and have such other authority
and powers as the Board of Directors of Fortune Products may delegate.



The court granted Fortenberry's proposed declarations that "Fortenberry, as president, has the
authority to manage and transact the day-to-day business of Fortune Products, Inc.," and
"Fortenberry, as president, has the authority to prescribe the duties of the employees and officers of
the company, subject to the limits set forth in this Order." The court denied the parties' other
requested declarations. Thereafter, the Cavanaughs amended their pleadings to include a
shareholder's derivative action and to name Mrs. Fortenberry as a defendant.


The Trial


 The jury trial occurred in October 2006. The parties agreed that the pending contempt
motion and attorney's fees would be tried to the court, and certain facts were not disputed. It was
undisputed that Fortune Products remained a solvent company with significant assets and few
liabilities, that the company's bylaws were adopted in 1984 and had not been amended, that the
shareholders and board of directors remained deadlocked in the management of the company's
affairs, that the Cavanaughs removed Fortenberry as a signatory from the company's operating and
investment accounts during the pendency of the case, and that Fortenberry, among other actions, had
incurred indebtedness, made payments with company checks, and entered into contracts on behalf
of the company without obtaining the Cavanaughs' agreement during the pendency of the case. 

 The Cavanaughs' theory to the jury was that the agreement between the parties was
for the Fortenberrys and the Cavanaughs to manage Fortune Products at the board level with neither
side having authority over the other, consistent with the bylaws and the manner in which
Fortenberry, Sr., and Betty Fortenberry managed the business when they were officers and directors. 
In addition to their own testimony, the Cavanaughs' witnesses included Burl Harper, David Scott
who was the controller of Fortune Products, James "Jim" Tipton who had a working friendship with
Fortenberry, Sr., Donald Stroud whose company had been one of Fortune Products' suppliers for
approximately 20 years, Mike Thelen who was a former employee of Fortune Products in inside
sales, and their experts, Joseph Picken and Greg Skelton. 

 Cavanaugh testified that he gave up a successful career to come to work for Fortune
Products in January 2000 after ongoing discussions with the family, including with Fortenberry,
about what his role would be at the company. He testified that the agreement from the beginning
was "50/50 ownership" between the two sides of the family with the directors in "control" of the
business. He testified to his duties at the company as vice president and his interactions with
Fortenberry through the time of trial. Cavanaugh testified that Fortenberry had prevented him from
participating in the business by, among other things, having the locks changed at the office, opening
and diverting mail addressed to Cavanaugh, denying Cavanaugh access to the company's computers,
and entering into contracts, incurring indebtedness, and making payments without the Cavanaughs'
prior knowledge or approval. David Scott testified consistently that Fortenberry had the locks
changed at the company, denied Cavanaugh access to the computers, diverted mail, and made
payments without his prior knowledge. 

 Mrs. Cavanaugh testified to her role at the business over the years and how her
parents managed the business together. She testified that the agreement between the two sides of
the family was for equal ownership and control and that, in the event the two sides were unable to
agree, the plan was for Jim Tipton to serve as the "tiebreaker." She testified that her father told them
that Fortenberry's title as "president" was "just a title that I promised to him when he was younger. 
It doesn't mean anything." 

 The Cavanaughs called other witnesses that testified to the 50/50 arrangement
between the families. Mike Thelen testified that he was an employee of Fortune Products from
October 2002 to the first part of 2004, that he took direction from both Fortenberry and Cavanaugh,
and to his "feeling it was a 50/50 split in the company" between the two sides of the family. Tipton
testified to a conversation that he had with Fortenberry, Sr., in the summer of 2000 after
Fortenberrry, Sr., was diagnosed with cancer:


 Q. Well, at some point in the summer of 2000, did you have an occasion to hear
from Mr. Fortenberry[, Sr.,] about--well, let me ask you this before that. 
Were you aware that Mr. Fortenberry[, Sr.,] had some plans for maybe
retiring or maybe passing the company along to the next generation?


 A. Not until after he told us he was diagnosed with cancer.


 Q. And when was that?


 A. That was in, I believe, early July of 2000.


* * *

 Q. And what did he tell you?


 A. He told me first about his cancer. He had just found out about it, and
obviously was quite concerned. And also his wife was quite concerned. And
he made the comment to me, he says, "Jim, I think I'm going to retire before
you do." I had planned to retire in 2002. And I said, "Oh? Why is that?" 
And then he told me he had been diagnosed with cancer and needed to start
making some plans at that point.


 Q. Did he talk with you about--actually, did he ask you to help him, or help
those who would be taking the company to the next--to the next stage?


 A. Yes.


 Q. Explain that to us, please.


 A. We talked about that right after the--we had a conversation about his cancer. 
And he said that it was his plan to leave the business to the two families, to
the Cavanaughs and the Fortenberrys. And they would all be on an equal
basis. They would all have equal shares of the company. But he didn't
elaborate on who was to do what. He didn't--he didn't indicate in any way
that one person would be--would have one responsibility and the other
would have another responsibility. He said he looked to the boys, as he
called Jay and Dale, called them "the boys." He looked to the boys to run the
company.

 


Tipton also testified that Fortenberry, Sr., asked him if he would be willing to serve as a fifth board
member, and Tipton said that he would. 

 Other witnesses to testify for the Cavanaughs included Harper, Stroud, and their
experts, Joseph Picken and Greg Skelton. Harper testified about his relationship with the company
and the parties starting in 1997 and his time at the company as the receiver. Stroud testified that his
company supplied materials to Fortune Products for approximately twenty years and to recent
problems that he had with the company. Picken testified to the value of Fortune Products and the
effect the deadlock between the parties has had on its value, and Skelton testified concerning
Fortenberry's submitted business expenses to the company.

 The Fortenberrys' theory to the jury was that Fortenberry was within his authority as
the president to manage and control the business on a day-to-day basis just as his father had done,
including changing Cavanaugh's duties as expressed in the June 2004 letter. Fortenberry testified
that his father, as president, "had the general and active management of the company day-to-day"
and that "some of the functions or decisions he made on a day-to-day basis for the company" were
"hiring employees," "setting salaries," "prescribing the duties of the employees of the company,"
"entering into leases," "borrowing money," and "signing checks."

 The Fortenberrys called other witnesses that testified consistently that Fortenberry,
Sr., made business decisions without involvement from his wife and that the agreement was for
Fortenberry to run the business the same way that his father had. David Shepherd, a former
employee of Fortune Products from 1997 to 2001, testified that Fortenberry, Sr., "was in complete
control of the company" and that he never saw Betty Fortenberry "take part in any business-related
decisions of any kind." Thomas Martin, a representative for Fortune Products to sell its product
during the time that Fortenberry, Sr., owned the company, testified that, to his knowledge,
Betty Fortenberry was not involved in the business "whatsoever" and that Fortenberry, Sr., told him
that Fortenberry would "be running my company." Robert Glanville, the company's attorney,
testified that Fortenberry, Sr., was "in charge" when he was there. James Obermier, who worked for
Fortune Products from May 1998 to July 2000, testified that Fortenberry, Sr., "made the final word
on everything." Randy Fortenberry, the brother of Fortenberry, Sr., who also worked in the business,
testified that he had worked at the business starting in 1993, that his brother made the "ultimate"
decisions when he was the president, that he was unaware of any part that Betty Fortenberry played
in business decisions, and that Fortenberry, Sr., told him that Fortenberry "was always going to make
the ultimate decision with the company."

 The Fortenberrys' witnesses also included Dan Durrenburger, an independent
representative for a company that supplied product to Fortune Products, and Thomas Glass, the
Fortenberrys' business valuation expert. Durrenburger testified that Fortenberry, Sr., told him that
he thought that he had made a mistake bringing Cavanaugh on board. Glass testified that
Fortune Products was not insolvent and that there was no threat of harm to the company in the
foreseeable future. 

 The jury's findings included that the parties "agreed the company would be operated
on a 50/50 basis, with neither party having final authority over the other," that the "directors of
Fortune Products, Inc., are deadlocked in the management of the corporate affairs of the Company
and that the shareholders are unable to break the deadlock," and "that such deadlock has caused or
is threatening to cause irreparable injury to Fortune Products, Inc." The jury found that Fortenberry
excluded the Cavanaughs from participation in the day-to-day operations of the Company; excluded
Cavanaugh from contact with the company's sales people, distributors, or customers; prevented
Cavanaugh from performing his duties as vice president; withheld information from the Cavanaughs
about the company's operations; altered the company's computer system to deny Cavanaugh access;
made purchases or entered into contracts not authorized by the board of directors; changed the locks
in order to deny the Cavanaughs access to the company's property; signed company checks without
authorization from the board of directors; and violated orders of the court regarding the company's
operations. The jury also found that Fortenberry, Cavanaugh, and Mrs. Cavanaugh had failed to
comply with their fiduciary duties to Fortune Products, but the jury awarded no damages for the
parties' respective failures to comply. 

 The jury declined to find that the Cavanaughs and the Fortenberrys agreed that
"Dale Fortenberry, Jr., as President, would have final authority on all corporate decisions," that
Fortenberry "dominate[d] control of the business and management" of the company or that he had
misapplied the assets of the company, maliciously suppressed dividends from the company, usurped
company opportunities for himself, received benefits that other shareholders did not receive, acted
deliberately to reduce the value of the Cavanaughs' stock, or used company funds to pay personal
expenses.


Proceedings after Trial


 After the jury trial and before the entry of final judgment, the Cavanaughs filed an
application for the appointment of an interim receiver and, after a hearing, the trial court appointed
Harper to serve as the receiver for the company. (4) The district court also held an evidentiary hearing
on attorney's fees and the Cavanaughs' motions for contempt and for sanctions and on the entry of
final judgment in November 2006. The district court ruled from the bench that it would "generally
render judgment on behalf of the [Cavanaughs]" and confirmed the appointment of Harper as the
receiver. The court also granted the Cavanaughs' request for attorney's fees and ordered an
accounting. 

 In February 2007, the district court entered its final judgment in favor of the
Cavanaughs. The district court made declarations based on the jury's verdict and, as a matter of law,
based on its finding that the bylaws were unambiguous. In the final judgment, the district court
granted the Cavanaughs' request for an accounting and for permanent injunctive relief, awarded
attorney's fees and costs to the Cavanaughs in the amount of $747,037.84, incorporated and
confirmed the order appointing Harper as the receiver, and incorporated by reference separate orders
for contempt and for sanctions. 

 In the separate order for contempt, the district court granted the Cavanaughs' motion
for contempt, finding that Fortenberry "has engaged in extensive conduct since the Order Granting
Temporary Injunction dated July 23, 2004, which has hindered, obstructed and damaged the ongoing
business of Fortune Products, Inc. His repeated attempts to unilaterally control and operate the
business have not only been in violation of the Court's order, but have in fact significantly harmed
the business." The district court ordered Fortenberry to pay a penalty of $25,000 to the Cavanaughs
and the Cavanaughs' attorney's fees for bringing the contempt motion, "which are included in the
attorneys fees amounts as ordered in the Court's final judgment entered in this case." 

 After the Fortenberrys' motion for judgment notwithstanding the verdict and, in the
alternative, motion for new trial was overruled, this appeal followed. 


ANALYSIS


Standard of Review


 The Fortenberrys' complaints on appeal include challenges to the district court's
award of attorney's fees, its appointment of a receiver, and the jury charge. A trial court's award of
attorney's fees, the appointment of a receiver, and complaint of jury charge error are reviewed under
an abuse of discretion standard. In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000) (standard of review
for complaints of jury charge error); Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998) (standard
of review for complaints that trial court erred in awarding attorney's fees pursuant to the Uniform
Declaratory Judgments Act); Abella v. Knight Oil Tools, 945 S.W.2d 847, 849 (Tex. App.--Houston
[1st Dist.] 1997, no writ) (standard of review for complaints that trial court erred in appointing a
receiver). A trial court abuses its discretion when it acts without reference to any guiding rules or
principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). 

 "The Declaratory Judgments Act entrusts attorney fee awards to the trial court's
sound discretion, subject to the requirements that any fees awarded be reasonable and necessary,
which are matters of fact, and to the additional requirements that fees be equitable and just, which
are matters of law." Bocquet, 972 S.W.2d at 21. "The appointment of a receiver, either as
authorized by statute or equity, will not be disturbed on appeal unless the record reveals a clear abuse
of discretion." Abella, 945 S.W.2d at 849. To reverse a judgment based on a claimed error in the
jury charge, a party also must show that the error "probably caused the rendition of an improper
judgment." Tex. R. App. P. 44.1(a)(1); see Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166
(Tex. 2002) (error in refusing an instruction); Niemeyer v. Tana Oil & Gas Corp., 39 S.W.3d 380,
387 (Tex. App.--Austin 2001, pet. denied) (error in jury charge). 

 The Fortenberrys further raise challenges to the legal and factual sufficiency of the
evidence to support portions of the judgment. A legal sufficiency challenge may only be sustained
when the record discloses one of the following situations:


 (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of
law or of evidence from giving weight to the only evidence offered to prove a vital
fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla;
[or] (d) the evidence establishes conclusively the opposite of the vital fact.



City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, "No
Evidence" & "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). In
determining whether a finding is supported by legally sufficient evidence, we view the evidence in
the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not." Id. at 807. We indulge every
reasonable inference that would support the finding. Id. at 822. In reviewing the factual sufficiency
of the evidence, we consider and weigh all the evidence in the record, including any evidence
contrary to the judgment. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989);
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We set aside a finding for factual insufficiency
"only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust." Cain, 709 S.W.2d at 176.

 This appeal also involves issues of statutory construction and the district court's
interpretation of the company's bylaws. We review matters of statutory construction de novo, and
our primary goal is to determine and give effect to the legislature's intent. City of San Antonio
v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language of the statute's
words and apply their common meaning. Id. Where the statutory text is unambiguous, we generally
adopt a construction supported by the statute's plain language. Id. Similarly, we review whether
bylaws are ambiguous de novo, and we apply ordinary principles of contractual interpretation. See,
e.g., MCI Telecomms. Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647, 650-51 (Tex. 1999) (whether
contract is ambiguous is question of law). "If the written instrument is so worded that it can be given
a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will
construe the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). We
construe written instruments as a whole in an effort to harmonize and give effect to all the provisions
of the instrument so that none will be rendered meaningless. Shell Oil Co. v. Khan, 138 S.W.3d 288,
292 (Tex. 2004). No single provision taken alone will be given controlling effect; rather, all the
provisions must be considered with reference to the whole instrument. Id. 

Attorney's Fees


 In their first issue, the Fortenberrys contend that the district court erred in awarding
attorney's fees because the Cavanaughs "are not, legally or factually, entitled" to an award of
attorney's fees. The Fortenberrys contend that the Cavanaughs' claim for declaratory judgment was
the only cause of action for which attorney's fees were recoverable, that it was "neither 'equitable'
nor 'just' to award the Cavanaughs attorney fees," and that the jury's findings "were substantially
against the Cavanaughs." They rely on the jury's findings that Fortenberry's conduct did not damage
the company, that the Cavanaughs failed to comply with their fiduciary duties to the company, and
that Fortenberry did not take actions that were at the Cavanaughs' expense. They further contend
that the Cavanaughs incurred substantial attorney's fees unrelated to their declaratory judgment claim
and that the Cavanaughs were required to segregate the attorney's fees that they incurred for their
declaratory judgment claim from their other claims.

 The issue of attorney's fees was tried to the district court, and an evidentiary hearing
was held in November 2006. Both the Fortenberrys and the Cavanaughs sought their incurred
attorney's fees, their attorneys testified in support of their requests, and neither side attempted to
segregate their attorney's fees. The district court awarded $747,037.84 to the Cavanaughs for their
attorney's fees and costs, which included $45,861.24 in costs, $100,000 in attorney's fees on appeal,
and $601,176 for trial level attorney's fees. The amount also included attorney's fees for the
Cavanaughs' bringing a motion for contempt and for sanctions. The Cavanaughs provided
billing records as exhibits and testimony to support the award of incurred attorney's fees at the
trial court level. 

 The Fortenberrys did not request findings of fact and conclusions of law as to the
district court's award of attorney's fees. See Tex. R. Civ. P. 296. On matters tried to the court,
where findings of facts and conclusions of law are not requested or filed, it will be implied that the
trial court made all the findings necessary to support its judgment. Worford v. Stamper, 801 S.W.2d
108, 109 (Tex. 1990) (per curiam); Toles v. Toles, 45 S.W.3d 252, 264 (Tex. App.--Dallas 2001,
pet. denied); Universal Health Servs., Inc. v. Thompson, 24 S.W.3d 570, 577 (Tex. App.--Austin
2000, no pet.). "In determining whether some evidence supports the judgment and the implied
findings of fact, 'it is proper to consider only that evidence most favorable to the issue and to
disregard entirely that which is opposed to it or contradictory in its nature.'" Worford, 801 S.W.2d
at 109 (quoting Renfro Drug Co. v. Lewis, 235 S.W.2d 609, 613 (Tex.1950)). The judgment must
be affirmed if it can be upheld on any legal theory that finds support in the evidence. Id. We,
therefore, must affirm the district court's award of attorney's fees if the award can be upheld on any
legal theory that finds support in the evidence. See id. 

 Attorney's fees are not recoverable unless authorized by statute or contract. 
Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310-11 (Tex. 2006); Strayhorn v. Raytheon
E-Systems, Inc., 101 S.W.3d 558, 571 (Tex. App.--Austin 2003, pet. denied). The parties did not
have an agreement that provided for attorney's fees; the attorney's fee award then must be authorized
by statute. The Cavanaughs contend that the district court's award of attorney's fees is supported
by their claim pursuant to the Uniform Declaratory Judgments Act (UDJA). See Tex. Civ. Prac.
& Rem. Code Ann. § 37.009 (West 2008). Pursuant to section 37.009 of the UDJA, "the court may
award costs and reasonable and necessary attorney's fees as are equitable and just." Id. The
Cavanaughs also contend that attorney's fees were recoverable pursuant to (i) articles 2.44(B) and
(D) and 5.14(j) of the Texas Business Corporation Act and (ii) their motion for contempt. See
Tex. Bus. Corp. Act Ann. arts. 2.44(B), (D) (directors' access to corporation's records with provision
for award of attorney's fees), 5.14(j) (derivative proceeding provision that allows attorney's fees at
conclusion of proceeding) (West 2003). Because we presume the district court awarded attorney's
fees to the Cavanaughs based on their claim for declaratory relief, we need not address the
Cavanaughs' additional grounds. See Worford, 801 S.W.2d at 109. (5) 

 In arguing that an award under the UDJA would not be "equitable" or "just," the
Fortenberrys rely on the jury's findings that the Cavanaughs did not comply with their fiduciary
duties to the company and that Fortenberry's actions did not damage the company or the Cavanaughs
and their contentions that the Cavanaughs incurred substantial fees on claims unrelated to their claim
for declaratory judgment and that the jury findings were against the Cavanaughs. See Tex. Civ. Prac.
& Rem. Code Ann. § 37.009. The jury declined to find that Fortenberry's actions injured the
company or the Cavanaughs, and it was undisputed that the Cavanaughs removed Fortenberry as a
signatory on company bank accounts without his agreement and without board authorization during
the pendency of this case. The Cavanaughs' actions to remove Fortenberry as a signatory, however,
occurred after Fortenberry wrote checks on the company's accounts without the Cavanaughs'
knowledge or approval, and the bylaws provide that Mrs. Cavanaugh as the treasurer had "custody
of the corporate funds." There was also evidence that Fortenberry repeatedly committed acts to
hinder the Cavanaughs' involvement in and knowledge of the company's affairs. 

 In granting attorney's fees pursuant to the UDJA, the district court, consistent with
the jury's verdict, could have found that the Cavanaughs prevailed on their claim for declaratory
relief--that the agreement between the parties was to manage the business on a 50/50 basis--and
that, based on the parties' conduct and explanations for their conduct, it was "equitable" and "just"
to award attorney's fees to the Cavanaughs. (6) See id. On this record, we cannot say that it was an
abuse of discretion for the district court to award attorney's fees to the Cavanaughs pursuant
to the UDJA. 

 Having concluded that the district court did not abuse its discretion in awarding
attorney's fees pursuant to the Cavanaughs' claim for declaratory relief, we turn to the issue of
segregation of attorney's fees. The Cavanaughs contend that the Fortenberrys did not preserve the
issue of segregation for our review because they did not object on that basis when the Cavanaughs
presented their evidence of attorney's fees. See, e.g., Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 389 
(Tex. 1997) ("if no one objects to the fact that the attorney's fees are not segregated as to specific
claims, then the objection is waived"); McCalla v. Ski River Dev., Inc., 239 S.W.3d 374, 383
(Tex. App.--Waco 2007, no pet.) (to preserve complaint that the opposing party failed to segregate
its attorney's fees, "[g]enerally, such an issue is preserved by objection during testimony offered in
support of attorney's fees or an objection to the jury question on attorney's fees"); Hong Kong Dev.,
Inc. v. Nguyen, 229 S.W.3d 415, 454 (Tex. App.--Houston [1st Dist.] 2007, no pet.) (objection to
failure to segregate preserved through objection to charge); Apache Corp. v. Dynegy Midstream
Servs., 214 S.W.3d 554, 566 (Tex. App.--Houston [14th Dist.] 2006, pet. granted) (failure to object
waives opposing party's failure to segregate). The Cavanaughs contend that, because the
Fortenberrys did not object at the hearing when the evidence was being presented, the district court
did not have the opportunity to correct any error and thus any error was waived. See Tex. R. App.
P. 33.1(a)(1) (to preserve complaint for appellate review, the complaint must be made to the trial
court by "a timely request").

 The Fortenberrys respond that the Cavanaughs had an affirmative obligation to
segregate their attorney's fees between recoverable and unrecoverable claims, which they failed to
do and that they were not required to object because the Cavanaughs' position was that their
attorney's fees "could not" be segregated:

 

 [The Cavanaughs] admit that they presented testimony that no attempt was made to
segregate and that they could not segregate. Under this scenario, there is no
requirement to ask [the Cavanaughs] to do what they had already stated that they
could not do and they need not be placed on notice to do what they had already stated
they could not do.



The Fortenberrys overstate the testimony of the Cavanaughs' attorney to the district court. 

 The Cavanaughs' attorney testified without objection to the amount, reasonableness,
and necessity of the attorney's fees that the Cavanaughs incurred and that segregation was not
required: 


 In looking at the issue of whether the time could be segregated out, my evaluation of
the case was that the fundamental dispute was always control of the corporation and
in finding an understanding of who was going to be in control of the corporation, and
the receivership was simply a remedy that was one way in which the dispute over
control could be resolved. And so I considered the dispute over control of the
corporation, who is in control, to be a central issue in this case and inextricably
intertwined with all the activity that occurred in the case.[ (7)]



The attorney also stated at the hearing that they presented detailed billing records in the event "the
court for some reason decides that segregation is necessary, that's one of the reasons that we put in
the month-by-month calculus, and we provided the individual detail for the accounts, if the Court
sees something that it doesn't think ought to be included, fine, mark it out." The records were
admitted as exhibits without objection. During cross-examination, the attorney testified as to the
Cavanaughs' various claims that "I've not attempted to do that [segregation] because we believe
they're inextricably intertwined." The Cavanaughs' position was not that they "could not" segregate
but that on this record it was not required. 

 The Fortenberrys' attorney similarly testified during cross-examination that the
Fortenberrys were seeking all of their attorney's fees pursuant to their declaratory judgment action:


 Q. And are you asking the Court to award all of the fees that you've testified to,
to the defendant, pursuant to its claim under the declaratory judgment
motion?

 

 A. I'm asking that the Court award our fees under the declaratory judgment
action, which is the defense of the claims made by the plaintiffs in this case
that we had no choice but to defend the claims that once they were made.


Both the Fortenberrys and the Cavanaughs sought their incurred attorney's fees, their attorneys
testified to support their requests, neither side attempted to segregate attorney's fees, and the parties
did not object to the opposing parties' failure to segregate attorney's fees prior to the district court
ruling from the bench that it was awarding attorney's fees to the Cavanaughs. (8) On this record, by
failing to object at the hearing on attorney's fees, we conclude that the Fortenberrys have not
preserved this issue for our review. See id. 

 Even if the Fortenberrys had preserved this issue, we would conclude that the district
court did not abuse its discretion in the amount of attorney's fees awarded. Pursuant to the supreme
court's guidelines, a claimant must segregate attorney's fees between claims for which attorney's
fees are recoverable and those for which fees are not recoverable. Chapa, 212 S.W.3d at 313. When
legal services advance both recoverable and unrecoverable claims, however, the services are so
intertwined that the associated fees need not be segregated. Id. at 313-14. The need to segregate fees
is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed
question of law and fact. Id. at 312-13. 

 The Fortenberrys argue that the only claim on which the Cavanaughs could recover
attorney's fees was their claim for declaratory relief. (9)
 In particular, they contend that the UDJA may
not be used to recover attorney's fees incurred in the appointment of a receiver. See Tex. Bus. Corp.
Act. Ann. art. 7.05 (West 2003) (appointment of receiver to rehabilitate corporation). The
Fortenberrys also rely on the Cavanaughs' pleadings after the trial court granted partial summary
judgment in January 2006 to contend that segregation was required. At that time, the Cavanaughs
requested that the district court render a final judgment on the parties' declaratory claims and sever
the declaratory claims from the other claims, arguing that the declaratory claims were "not so
interwoven with the remaining action that they involve the same facts and issues." The district court,
however, denied the Cavanaughs' request for severance. 

 The Fortenberrys did not provide controverting testimony or object to the
Cavanaughs' attorney's testimony that "I considered the dispute over control of the corporation, who
is in control, to be a central issue in this case and inextricably intertwined with all the activity that
occurred in this case." The Fortenberrys also continue to seek all of their attorney's fees based on
their own declaratory action on appeal. That they seek the very same recovery that they argue the
Cavanaughs may not undermines their position and is further support for the district court's award. 
Because the Fortenberrys did not request findings of fact and conclusions of law, we may imply a
finding by the trial court that the Cavanaughs met their burden that they were not required to
segregate their incurred attorney's fees. See Worford, 801 S.W.2d at 109; Toles, 45 S.W.3d at 264.
We conclude that the district court could have found that the legal services provided to the
Cavanaughs advanced both recoverable and unrecoverable claims so that the services were "so
intertwined that [the attorney's fees] need not be segregated." See Chapa, 212 S.W.3d at 314. 

 Although the jury made findings in favor of the Fortenberrys, the jury, as well as the
judge, resolved the control issues that were the subject of the Cavanaughs' claim for declaratory
relief in the Cavanaughs' favor. Based on the record before us and under the circumstances of this
case, we cannot conclude that the trial court abused its discretion in awarding $747,037.84 in
attorney's fees and costs to the Cavanaughs. We overrule the Fortenberrys' first issue.


Declaratory Judgment


 In their second issue, the Fortenberrys contend that the evidence is legally and
factually insufficient to support declaratory judgment in favor of the Cavanaughs and that the
Fortenberrys are entitled to declaratory judgment as a matter of law and their attorney's fees based
on the unambiguous bylaws. Alternatively, the Fortenberrys request this Court to reverse the
declaratory judgment and remand for a new trial. (10) The Fortenberrys contend, based on the
unambiguous bylaws, that Fortenberry as president has the authority to hire and fire employees, enter
contracts on behalf of the company, expend money for corporate purposes, sign on company bank
accounts, and prescribe duties for employees not in conflict with the bylaws. In particular, the
Fortenberrys contend the bylaws authorized Fortenberry to prescribe Cavanaugh's duties as stated
in the June 2004 letter. 


 1. Interpretation of Bylaws


 The Fortenberrys rely on the first sentence in section 5.07 and section 5.09 of the
bylaws to support their interpretation that the bylaws authorize Fortenberry to act on behalf of the
company without specific board authorization. The first sentence of section 5.07 states that "[t]he
Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer to enter
into any contract or execute and deliver any instrument in the name of and on behalf of the
corporation, and such authority may be general or confined to specific instances." Section 5.09 states
that the "President shall be the chief executive officer of the corporation, shall have general and
active management of the business of the corporation, and shall see that all orders and resolutions
of the Board of Directors are carried into effect." 

 Relying on these two sections, the Fortenberrys contend that section 5.07 authorizes
the board of directors to generally delegate its authority, and that, in section 5.09, the board of
directors generally delegated to the president the "management" of the company, similar to the duties
of a "general manager" which is "a very broad delegation of power by the board of directors." 
Relying on article 2.31(A) of the business corporation act, the Fortenberrys further contend that "the
board of directors of Fortune Products chose to generally delegate the 'management' of the company,
which is the exact term and the entirety of the authority held by a board of directors as stated in the
Texas Business Corporation Act." See Tex. Bus. Corp. Act Ann. art. 2.31(A) (West 2003). (11) The
Fortenberrys contend that their interpretation is consistent with the board's historical delegation of
the company's management generally to Fortenberry, Sr., including his authority to prescribe other
officers' duties, and that this general delegation remained when Fortenberry became president.

 The district court agreed with the Fortenberrys that the bylaws were not ambiguous
and that they should be interpreted as a matter of law but disagreed with the Fortenberrys'
interpretation. The district court interpreted the bylaws to limit the president's authority to take
certain actions without board authorization, including changing the duties of other officers. The
district court explained its interpretation in the following findings:

 

 a. Defendant Dale Fortenberry, Jr., has no inherent powers by virtue of his
office as President to bind Fortune Products, except as to routine matters
arising in the ordinary course of business. [Order Granting Plaintiffs' MSJ
No. 2];


 b. Defendant Dale Fortenberry, Jr., has no power or authority to set, increase,
reduce or discontinue the wages or salary of any officer or employee of
Fortune Products, except as authorized by the Board of Directors of Fortune
Products. [Order Granting Plaintiffs' MSJ No. 5];


 c. Plaintiff Jay Cavanaugh, as Vice President, is authorized, in the absence or
disability of the President, to perform the duties and have the authority and
exercise the powers of the President. [Order Granting Plaintiffs' MSJ No. 8];


 d. Plaintiff Jay Cavanaugh, as Vice President, shall perform such other duties
and have such other authority and powers as the Board of Directors of
Fortune Products may delegate. [Order Granting Plaintiffs' MSJ No. 9];


 e. Pursuant to the Bylaws of Fortune Products, there are limits on the
President's employee and management authority and responsibility. These
are found, principally, in § 5.03 of the Fortune Products Bylaws, and include
the following:


 1. The power to hire officers and employees for such length of time and
on such terms as the Board chooses; and

 2. The power to fix the salaries of officers and employees.


 Moreover, the President's managerial authority is limited by the
express duties of the vice-president, the chairman of the board, the
secretary and the treasurer set out in the Bylaws. [Order Granting
MSJ at p. 4];


 f. Pursuant to the Bylaws of Fortune Products, Defendant Dale Fortenberry has
no power or authority to bind Fortune Products to any contract or engagement
or to pledge its credit or to render it liable pecuniarily for any purpose or in
any amount, unless authorized to do so by the Board of Directors of Fortune
Products [Bylaws of Fortune Products at § 5.07];


 g. Pursuant to the Bylaws of Fortune Products, Defendant Dale Fortenberry has
no power or authority to delegate or to remove any duties or other authority
of Plaintiff Gerald Cavanaugh, as Vice President of Fortune Products
[Bylaws at § 5.10];

 

 h. Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as
Vice President, is authorized, in the absence or disability of the President, to
perform the duties and have the authority and exercise the powers of the
President [Bylaws at § 5.10]; and

 

 i. Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as
Vice President, shall perform such other duties and have such other authority
and powers as the Board of Directors of Fortune Products may delegate
[Bylaws at § 5.10].



 We agree that the bylaws are unambiguous and interpret them as a matter of law. See
Coker, 650 S.W.2d at 393. Turning to the sections that the Fortenberrys rely on for the president's
authority, the Fortenberrys' interpretation of section 5.07 and 5.09 ignores the plain language of
those sections and the bylaws as a whole. See Khan, 138 S.W.3d at 292. Section 5.07 expressly
limits the board of director's authority to delegate "as otherwise provided in these Bylaws." (12) 
Moreover, because section 5.03 provides that the board of directors "shall have the power to enter
into contracts for the employment and compensation of officers and employees on such terms and
for such length of time as the Board deems advisable," the plain language of section 5.07 does not
support an interpretation that the board of directors may generally authorize the president to enter
into contracts of employment. 

 Similarly, the scope of the delegation in section 5.09 to the president to "manage" the
company, must be construed in context with the bylaws as a whole, including section 5.03 that
reserves to the board of directors the power to enter into employment contracts, the sections that set
out the duties of other officers, and section 3.01 that provides that the board of directors will manage
the company. Section 3.01 of the bylaws states that "the business and affairs of the corporation shall
be governed and managed by its Board of Directors." Section 5.08 provides that the chairman of the
board "shall have such powers and duties as may from time to time be prescribed by the Board of
Directors, upon written direction given to him pursuant to resolution duly adopted by the Board of
Directors." Section 5.10 provides that vice-presidents "shall, in the absence or disability of the
President, perform the duties and have the authority and exercise the powers of the President" and
"shall perform such other duties and have such other authority and powers as the Board of Directors
may from time to time delegate." Section 5.13 states that the treasurer "shall have the custody of the
corporate funds and securities," and section 5.14 states that the treasurer "shall disburse funds of the
corporation as may be ordered by the Board of Directors." By expressly addressing officers' duties
and authorizing the board of directors to set the officers' duties, the bylaws as a whole, at a
minimum, limit the president's "management" authority in section 5.09 and do not authorize the
president to prescribe other officers' duties. See id. 

 The cases that the Fortenberrys cite to support their argument that the bylaws
delegated the company's management to the president are inapposite. See San Antonio Joint Stock
Land Bank v. Taylor, 105 S.W.2d 650 (Tex. 1937); Ennis Bus. Forms, Inc. v. Todd, 523 S.W.2d 83
(Tex. Civ. App.--Waco 1975, no writ); Miller v. A.&N. R.R. Co., 476 S.W.2d 389 (Tex. Civ.
App.--Beaumont 1972, writ ref'd n.r.e.). (13) In Taylor, the court states that "the rule is generally
accepted that the president of a corporation may be entrusted by the board of directors with the
management of the business of such corporation, and he may perform for the corporation the
business it is authorized to transact." 105 S.W.2d at 654. Here, the dispute is not whether a board
of directors may delegate its authority to a president, but the extent of any such delegation. 

 In Todd, the board of directors did not expressly authorize the employment contract
with a non-officer employee, but the court found that the president was authorized to execute the
contract because the bylaws authorized the president to execute contracts "in the ordinary course." 
523 S.W.2d at 86. The bylaws in this case are converse; section 5.07 expressly requires the board
of directors to authorize an officer to execute a contract. In Miller, the court determined that the
president was authorized to hire the general manager but, unlike the bylaws in this case, the
bylaws specifically "provided for the appointment of a General Manager by the President." 
476 S.W.2d at 393. 

 Construing the bylaws as a whole, we conclude that the district court did not err in
its declarations based on the bylaws, including that the bylaws do not authorize Fortenberry, as the
president, to prescribe Cavanaugh's duties. See Khan, 138 S.W.3d at 292; see also Templeton
v. Nocona Hills Owners Assn, Inc., 555 S.W.2d 534, 538 (Tex. Civ. App.--Texarkana 1977, no writ)
("settled rule in Texas is that a corporation president, merely by virtue of his office, has no inherent
power to bind the corporation except as to routine matters arising in the ordinary course of
business"); see also Tex. Bus. Corp. Act Ann. art. 2.42(B) (West 2003) ("All officers . . . , as
between themselves and the corporation, shall have such authority and perform such duties in the
management of the corporation as may be provided in the bylaws, or as may be determined by
resolution of the board of directors not inconsistent with the bylaws."). 


 2. Sufficiency of Evidence to Support Jury Findings


 Finding that the bylaws do not, as a matter of law, allow Fortenberry to prescribe
Cavanaugh's duties, we next consider the Fortenberrys' challenge to the sufficiency of the evidence. 
Because the Fortenberrys globally challenge the legal and factual sufficiency of the district court's
declarations, we review the district court's declarations based on the jury verdict to the extent the
Fortenberrys have addressed the particular declarations in their briefing. See Tex. R. App. P. 38.1. 
The district court made the following declarations based on the jury's verdict in favor of the
Cavanaughs:


 a. The Plaintiffs, Jay Cavanaugh and Dianna Cavanaugh, and the Defendants,
Roland D. Fortenberry, Jr. and Kaye Ann Fortenberry, agreed that the
company would be operated on a 50/50 basis, with neither party having final
authority over the other. [Question No. 1A]


 b. The Plaintiffs, Jay Cavanaugh and Dianna Cavanaugh, and the Defendants,
Roland D. Fortenberry, Jr. and Kaye Ann Fortenberry, did not agree that
Defendant Dale Fortenberry, Jr., as President, would have final authority on
all corporate decisions. [Question No. 1A]


 c. The directors of Fortune Products, Inc., are deadlocked in the management
of the corporate affairs of the Company and the shareholders are unable to
break the deadlock. [Question No. 2]


 d. Such deadlock has caused or is threatening to cause irreparable injury to
Fortune Products, Inc. [Question No. 3]

 

 e. Defendant Dale Fortenberry, Jr., excluded Plaintiffs Jay Cavanaugh or
Dianna Cavanaugh from participation in the day to day operations of the
Company. [Question No. 4C]

 

 f. Defendant Dale Fortenberry, Jr., excluded Plaintiff Jay Cavanaugh from
contact with the Company's sales people, distributors and customers.
[Question No. 4D]

 

 g. Defendant Dale Fortenberry, Jr., prevented Plaintiff Jay Cavanaugh from
performing his duties as Vice President. [Question No. 4E]

 

 h. Defendant Dale Fortenberry, Jr., withheld information from Plaintiffs Jay and
Dianna Cavanaugh about Fortune Products, Inc.'s operations. [Question No.
4F]

 

 i. Defendant Dale Fortenberry, Jr., altered Fortune Products, Inc.'s computer
system to deny Plaintiff Jay Cavanaugh access. [Question No. 4G]

 

 j. Defendant Dale Fortenberry, Jr., made purchases or entered into contracts not
authorized by the Board of Directors of Fortune Products, Inc. [Question No.
4K]


 k. Defendant Dale Fortenberry, Jr., changed the locks in order to deny Plaintiffs
Jay and Dianna Cavanaugh access to Fortune Products, Inc.'s products.
[Question No. 4L]

 

 l. Defendant Dale Fortenberry, Jr., signed checks on behalf of Fortune Products,
Inc., without authority from the Board of Directors. [Question No. 4M]

 

 m. Defendant Dale Fortenberry, Jr., violated orders of the Court regarding
Fortune Products, Inc. operations. [Question No. 4N]



The Fortenberrys' complaint is directed at the jury's findings concerning the parties' agreement as
to the company's management and control. We limit our review of the evidence then to the
declarations concerning the company's management and control.

 Viewing the evidence in the light most favorable to the district court's declarations
based on the jury verdict, the Cavanaughs testified that their agreement with the Fortenberrys was
for the business to be managed with equal input, that the parties were deadlocked, and that the
deadlock was causing injury to the company. Cavanaugh testified that the plan from the beginning
was that the company would be equally owned, the board of directors evenly divided, and not that
he would report to Fortenberry. Mrs. Cavanaugh testified that the agreement was to manage the
business as her parents had--at the board level, and, in the event the families were unable to agree,
the plan was for Tipton, a close friend of Fortenberry, Sr., to serve as the "tiebreaker." Tipton
testified that Fortenberry, Sr., asked him if he would be willing to be a fifth board member. We
conclude the evidence was legally sufficient to support the district court's declarations as to the
management and control of the company based on the jury verdict. See City of Keller, 168 S.W.3d
at 807, 810.

 Viewing all of the evidence, the Fortenberrys provided controverting evidence that
the parties' agreement was for Fortenberry, as the president, to control the company as it was
controlled historically by Fortenberry, Sr.; that he was authorized, as the president, to take actions
on behalf of the company, including prescribing Cavanaugh's duties, incurring indebtedness, and
entering into contracts; and that the parties' deadlock had not injured the company. Fortenberry,
Shepherd, Martin, and Randy Fortenberry testified that Fortenberry, Sr., managed and controlled the
business and that he did so without involvement from Betty Fortenberry. There was evidence that
Cavanaugh did not question the authority of Fortenberry, Sr., when he was the president, and Glass
testified that there was no threat of harm to the company in the foreseeable future.

 The Fortenberrys also rely on documentary evidence: a letter dated May 31, 1990, to
all personnel from Fortenberry, Sr., advising them that Fortenberry was appointed to the position of
vice president, and that, in his absence, Fortenberry "will be in charge of all day to day activities";
Fortenberry, Sr.'s appointment of Randy Fortenberry in 1995 to the position of production manager;
and the memorandum from Fortenberry, Sr., to all personnel that advised them of Cavanaugh's
position as vice president of finance and administration. The Fortenberrys argue that, because
Fortenberry, Sr., initially set Cavanaugh's terms of employment as well as other employees' terms
of employment, that Fortenberry, as the succeeding president, was authorized to change employment
terms on behalf of the company and that a declaration from the court to that effect would resolve the
parties' deadlock. 

 The Cavanaughs' testimony as to the company's management structure, however, was
consistent with the district court's interpretation of the bylaws, the equal ownership of the company's
shares, the evenly-divided board of directors, the shareholders agreement requiring the shareholders
to vote for each other as directors, and the company's minutes. When the parties met as shareholders
and as a board of directors for their annual meetings from 2000 to 2002, the minutes reflect that the
directors resolved that "all proceedings of the board of directors since the last meeting of
shareholders, and all acts taken by members of the board of directors or by officers of the
corporation, are hereby ratified and approved in all respects." These annual resolutions are
consistent with the directors managing the business on an equal basis. The minutes also reflect that
a special meeting was held on September 5, 2000, for the purpose of "considering new business
strategies to grow the business." Occurring shortly after the purchase, this meeting supports the
Cavanaughs' position that the agreement was for business decisions to be made at the board level. 

 The minutes during the time period that the company's directors were Fortenberry,
Sr., and Betty Fortenberry also support that the agreement was for the company to be managed and
controlled at the board level. The minutes reflect that, from 1984 until the sale in 2000, the directors,
Fortenberry, Sr., and Betty Fortenberry, elected officers annually and made decisions at the board
level including to relocate the business, to purchase a company car, to pay shareholders' dividends,
and to promote Fortenberry to vice president. Minutes from annual meetings during this time also
contain resolutions ratifying and approving the actions of the directors and officers. 

 The parties presented conflicting evidence of their agreement and conduct
surrounding the company's day-to-day management. The jury could have resolved the conflicting
evidence to conclude that Fortenberry, Sr., and Betty Fortenberry managed the company from the
board level or, even if Fortenberry, Sr., unilaterally made business decisions for the company,
Fortenberry did not have the same authority as his father who was president, majority shareholder,
and chairman of the board. See McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986) (fact
finder is "the sole judge of the credibility of the witnesses and the weight to be given their
testimony," may believe one witness, disbelieve others, and "resolve inconsistencies in the testimony
of any witness"). The jury resolved the conflicts as to the parties' agreement in the Cavanaughs'
favor. We conclude that the district court's declarations based on the jury verdict were not "so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." See Cain,
709 S.W.2d at 176. We overrule the Fortenberrys' second issue.


Jury Charge Error


 In their third issue, the Fortenberrys contend that jury questions 1A, 1B, 3, and 4 and
accompanying instructions were erroneous, probably caused the rendition of an improper judgment,
and cannot provide a basis for the district court's judgment. Question 1A asked the jury what the
parties agreed as to the company's management and operation; question 1B asked the jury to
interpret the bylaws; question 3 asked the jury whether the directors' deadlock was causing
irreparable injury to the company; and question 4 asked the jury if Fortenberry had engaged in
certain actions. 

 The Fortenberrys contend that question 1A was erroneous because "the Court asked
the jury to determine if there was some collateral agreement, other than the bylaws, reached as of
August 1, 2000, to 'operate' the company on a '50/50 basis'" and that the district court erred in
submitting questions 1A and 1B and rendering judgment based on the jury's answers because the
questions had "no relevance to the controlling issue in the declaratory judgment--what is the nature
and extent of the corporate president's authority as reflected in the corporate bylaws?" They contend
that the district court should have determined the issue of authority as a matter of law based on the
unambiguous bylaws. They also contend that question 1A contains instructions and definitions
"which are substantially erroneous and constitute misstatements of the law" because the jury was
allowed to consider all the evidence admitted at the trial, including the parties' conduct and the
history of the company. 


 Question 1A and 1B to the jury, in relevant part, were as follows:

 Question 1A


 Did the Plaintiff Cavanaughs and the Defendant Fortenberrys agree that as of August
1, 2000, the company would be operated on a 50/50 basis, with neither party having
final authority over the other, or did they agree that Dale Fortenberry, Jr., as
President, would have final authority on all corporate decisions.

 

 Agreements may be expressed or demonstrated by the course of dealings between the
parties. You may consider all of the evidence admitted in this case, including the
parties' conduct, the bylaws of Fortune Products, Inc. and the history of the company.


 Question 1B


 It is your duty to interpret the bylaws of Fortune Products, Inc.

 

 Under the Bylaws, does the President, Dale Fortenberry, Jr. or some other officer of
the Company have the final authority to do the following, or do the following require
action of the Board of Directors?

 

* * *


 Consider all of the facts and circumstances surrounding the adoption of the bylaws,
the interpretation placed on the bylaws by the parties, the conduct of the parties and
the course of dealing of the parties.

 

 A "course of dealing" is a sequence of previous conduct between the parties under
the bylaws which is fairly to be regarded as establishing a common basis of
understanding the bylaws.

 

* * *

 

 You may consider all of the evidence admitted in this case, including the parties'
conduct, the bylaws of Fortune Products, Inc. and the history of the company.

 

 1. decide whether to reimburse an expense incurred by a company employee as
a business expense?


 2. determine who has signature authority on company bank accounts including,
but not limited to, the IBC bank account and the Merrill Lynch account?


 3. hire and fire employees?



The jury answered question 1A by finding that the parties agreed to operate the business on a
"50/50" basis and answered "no" to each question in 1B, except the jury found that board action was
required to determine who has signature authority on company bank accounts. 

 Even if we were to conclude that the district court erred in submitting questions
1A and 1B with their accompanying instructions to the jury, the jury's answers to question 1B were
not incorporated in the final judgment and, as to question 1A, the jury's answer that the parties
agreed to operate the business on a "50/50 basis" is consistent with the district court's interpretation
of the bylaws, including that the bylaws limit Fortenberry's authority as the president to prescribe
the duties of other officers. Having concluded that the district court did not err in its interpretation
of the bylaws, we conclude that any error in submitting questions 1A and 1B did not probably cause
the rendition of an improper judgment. See Tex. R. App. P. 44.1(a)(1). 

 The Fortenberrys' complaint as to question 3 is that the district court erred by refusing
to include a definition of "irreparable injury." Question 3 asked the jury: 

 

 Do you find that such deadlock has caused or is threatening to cause irreparable
injury to Fortune Products, Inc.?



The Fortenberrys contend that "irreparable injury" is not a term with which ordinary jurors can be
expected to be familiar and that the jury should have been instructed that "[a]n injury is 'irreparable'
if the injured party cannot be adequately compensated in damages or if the damages cannot be
measured by any certain pecuniary standard." Question 3 is relevant to the district court's
appointment of a receiver, and it was for the district court to determine whether to appoint a receiver
pursuant to the applicable statutes. See Tex. Bus. Corp. Act Ann. art. 7.05; Tex. Civ. Prac. & Rem.
Code Ann. § 64.001(a)(3), (6) (West 2008). Even if we were to conclude that the trial court erred
in refusing to include a definition of "irreparable injury," we conclude that any error did not probably
cause the rendition of an improper judgment. See Tex. R. App. P. 44.1(a)(1). 

 Question 4 asked the jury if Fortenberry, Jr., had engaged in certain actions:


 Do you find that Dale Fortenberry, Jr., engaged in any of the following actions?

 

* * *

 You are instructed that Dale Fortenberry, Jr., is responsible for his actions as well as
those persons, if any, who acted with him with knowledge of, agreement with, and
intention to accomplish a common objective or course of action.


 You are instructed that Jay and Dianna Cavanaugh, as directors of Fortune Products,
Inc., are entitled to have access to and inspect all books and records of Fortune
Products, Inc.


 A. Misapplied the assets of Fortune Products, Inc.?


 B. Maliciously suppressed dividends from Fortune Products, Inc.?


 C. Excluded Jay or Dianna Cavanaugh from participation in the day to day
operations of the company?

 

 D. Excluded Jay Cavanaugh from contact with the Company's sales people,
distributors, or customers?


 E. Prevented Jay Cavanaugh from performing his duties as Vice President?

 

 F. Withheld information from Jay and Dianna Cavanaugh about Fortune
Products, Inc. operations?

 

 G. Altered Fortune Products, Inc.'s computer system to deny Jay Cavanaugh
access?

 

 H. Usurped corporate opportunities for Fortune Products, Inc. for himself?

 

 I. Received benefits that other shareholders of Fortune Products, Inc. did not
receive?

 

 J. Acted to deliberately reduce the value of the Cavanaughs' stock?

 

 K. Made purchases or entered into contracts not authorized by the Board of
Directors of Fortune Products, Inc.?


 L. Changed the locks in order to deny Jay and Dianna Cavanaugh access to
Fortune Products, Inc. property?

 

 M. Signed checks on Fortune Products, Inc. without authority from the Board of
Directors?

 

 N. Violated orders of the Court regarding Fortune Products, Inc. operations?

 

 O. Used Fortune Products, Inc. funds to pay personal expenses?



In their briefing to this Court, the Fortenberrys fail to address how the submission of this question
was error or how it caused the rendition of an improper judgment. They also rely on the jury's
negative findings to question 4 to support their own arguments. They, therefore, have waived any
error in the submission of question 4. See Tex. R. App. P. 38.1(h). Additionally, even if we were
to conclude that the district court's submission of question 4 was in error, we conclude that any such
error did not probably cause the rendition of an improper judgment. See Tex. R. App. P. 44.1(a)(1). 
We overrule the Fortenberrys' third issue.

 

Receivership 


 In their fourth issue, the Fortenberrys contend that the evidence is legally and
factually insufficient to support the district court's judgment appointing a receiver. In the final
judgment, the district court found that the appointment of a receiver was "required to conserve the
assets and business of Fortune Products, Inc., and to avoid damage to parties in interest, in
accordance with Article 7.05 of the Texas Business Corporation Act, Section 64.001 et seq. of the
Texas Civil Practice and Remedies Code, and the equitable powers of the Court." The district court
"incorporated herein by reference for all purposes as if fully set forth verbatim" the order appointing
receiver dated October 27, 2006, and confirmed the appointment of Harper as the receiver pursuant
to the terms of the October 27, 2006, order. The Fortenberrys did not request findings of fact and
conclusions of law as to the receivership order. We, therefore, will uphold the appointment on any
legal theory supported by the record. See Worford, 801 S.W.2d at 109.

 Article 7.05 of the business corporation act provides for the appointment of a receiver
to rehabilitate a corporation as follows: 


 A. A receiver may be appointed for the assets and business of a corporation by
the district court for the county in which the registered office of the
corporation is located, whenever circumstances exist deemed by the court to
require the appointment of a receiver to conserve the assets and business of
the corporation and to avoid damage to parties at interest, but only if all other
requirements of law are complied with and if all other remedies available
either at law or in equity, including the appointment of a receiver for specific
assets of the corporation, are determined by the court to be inadequate, and
only in the following instances:

 

 (1) In an action by a shareholder when it is established:

 

 (a) That the corporation is insolvent or in imminent danger of
insolvency; or

 

 (b) That the directors are deadlocked in the management of the
corporate affairs and the shareholders are unable to break the
deadlock, and that irreparable injury to the corporation is
being suffered or is threatened by reason thereof; or

 

 (c) That the acts of the directors or those in control of the
corporation are illegal, oppressive or fraudulent; or

 

 (d) That the corporate assets are being misapplied or wasted.

 

 (e) That the shareholders are deadlocked in voting power, and
have failed, for a period which includes at least two
consecutive annual meeting dates, to elect successors to
directors whose terms have expired or would have expired
upon the election and qualification of their successors.


Tex. Bus. Corp. Act Ann. art. 7.05(A)(1). Section 64.001 of the civil practice and remedies code
provides that a court may appoint a receiver in an action between "partners or others jointly owning
or interested in any property or fund" or "in any other case in which a receiver may be appointed
under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(3), (6). 

 As a preliminary matter, the Cavanaughs contend that this Court lacks jurisdiction
to address Harper's appointment as a receiver because the Fortenberrys should have appealed his
appointment within twenty days of October 27, 2006, the date the district court entered its order
initially appointing Harper to be the receiver, and that the Fortenberrys' remedy at this point is to file
a motion to terminate the receivership. See Sclafani v. Sclafani, 870 S.W.2d 608, 611
(Tex. App.--Houston [1st Dist.] 1993, writ denied) (distinguishing between an action to terminate
a receivership with an action to set aside the receivership). The Fortenberrys counter that, although
they could have filed an interlocutory appeal from the October 27, 2006, order appointing Harper
as the receiver, they also may appeal the appointment from the final judgment.

 Rule 26.1(b) of the rules of appellate procedure provides that an interlocutory appeal
"must be filed within 20 days after the judgment or order is signed." Tex. R. App. P. 26.1(b). 
Section 51.014(a)(1) of the civil practice and remedies code provides that a party "may appeal from
an interlocutory order" that "appoints a receiver." Tex. Civ. Prac. & Rem. Code § 51.014(a)(1)
(West 2008); see also Tex. Gov't Code Ann. § 311.016(1) (West 2005) ("'May' creates discretionary
authority or grants permission or a power."). The parties agree that the Fortenberrys had the right
to file an interlocutory appeal from the October 27, 2006, order appointing Harper. The issue then
is whether the Fortenberrys were required to bring an interlocutory appeal from the initial
appointment to preserve error. If the Fortenberrys were required to file an interlocutory appeal to
preserve error, the Fortenberrys' notice of appeal in May 2007 was not timely, and this Court
lacks jurisdiction. 

 The Fortenberrys rely on Wilkins v. State Farm Mutual Automobile Insurance Co.,
58 S.W.3d 176, 179 (Tex. App.--Houston [14th Dist.] 2001, no pet.), and the fact that the order
appointing Harper was titled an "interim" order to support their contention that they may appeal
Harper's appointment as part of the appeal from the final judgment. The Fortenberrys' argument that
the receivership order was an "interim" order is unpersuasive; the order's expressed terms allowed
for the receivership to continue for three years. In Wilkins, the appellant did not challenge the
receivership itself, but that the "trial court lacked jurisdiction to enter the turnover order because a
turnover order can only follow from a final judgment." Id. at 178. Our sister court found that it had
jurisdiction to hear the appeal from the turnover order even though the appeal was not filed within
twenty days of the turnover order by concluding the order was final, distinguishing the appointment
of a receiver that "begins a proceeding" from a turnover order "even though it may appoint a
receiver." Id. at 179-80. In contrast, the Fortenberrys challenge the receivership itself. 

 Our sister courts that have addressed this issue have concluded that the "right to
appeal the order of receivership itself must be exercised within twenty days after the receivership
order is entered." See Long v. Spencer, 137 S.W.3d 923, 926 (Tex. App.--Dallas 2004, no pet.)
(citing Sclafani, 870 S.W.2d at 611). In Long, the appellant appealed from the trial court's judgment
disbursing the proceeds from the sale of real property in a suit for partition. 137 S.W.3d at 924-25. 
Because the initial appointment of the receiver was by agreed order, the court concluded that the
"general receiver-based complaints and complaints concerning the original receiver were appealable
after entry" of the agreed order. Id. at 926 n.2. The court dismissed the issues raised concerning the
initial appointment for lack of jurisdiction because "[a] challenge to the receivership order after
twenty days has passed is untimely and will be dismissed by the appellate court." Id. at 926 (citing
Sclafani, 870 S.W.2d at 613). 

 In Sclafani, the court dismissed the appeal from the overruling of a motion to set aside
a receivership for lack of jurisdiction, explaining the policy reasons behind the twenty-day
requirement for appealing the establishment of a receiver:


 A contrary holding would mean that a party could rightfully attempt to set aside an
order of receivership in an appeal regardless of how long ago the receivership order
was entered. The setting aside of an order of receivership has "the effect of
nullifying all intervening acts of the receiver . . . or, at least, of raising serious
questions concerning the validity of such intervening acts." Christie v. Lowrey, 589
S.W.2d 870, 873 (Tex. Civ. App.--Dallas 1979, no writ). Allowing the vacation of
a receivership at any time after its creation would work undue hardship on third
parties who have dealt in good faith with the receiver. Furthermore, an unlimited
time to appeal would mean that the order of receivership would never be beyond
challenge, and thus never attain the finality upon which the parties, the receiver, and
those who have transacted with the receiver, are entitled to depend.



Sclafani, 870 S.W.2d at 611. 

 This Court has also held that the failure to file an appeal from the order establishing
a receivership within twenty days requires dismissal of complaints that "test the validity" of the
receivership itself. See Benningfield v. Benningfield, 155 S.W.2d 827, 827 (Tex. Civ. App.--Austin
1941, no writ). In Benningfield, the original receiver did not qualify, and a subsequent order was
entered appointing a different receiver with the same powers and duties. Id. This Court dismissed
the appeal because the appeal bond was filed twenty-two days after the original order appointing the
receiver. Id. at 828.

 Given the nature of a receivership, a party's ability to seek termination or
modification, and the policy reasons behind the twenty-day time limit to appeal, we conclude that
the Fortenberrys were required to appeal the appointment of the receiver within twenty days from
the October 27, 2006, order. (14) We, therefore, conclude that we lack jurisdiction to address the
district court's initial appointment of Harper as the receiver. (15) 

 Further, even if we were to conclude that this Court has jurisdiction to consider the
receiver's appointment, we would conclude that the district court did not abuse its discretion when
it appointed a receiver for the company. See Abella, 945 S.W.2d at 849. It was undisputed that the
shareholders were deadlocked in their voting power. At the time of the trial in October 2006, the
minutes reflect that the shareholders' last election of directors was in 2002. The district court,
therefore, could have appointed the receiver pursuant to article 7.05(A)(1)(e) because the
shareholders were deadlocked and they had failed to elect successors for over two years at the time
of trial. See Tex. Bus. Corp. Act Ann. art. 7.05(A)(1)(e). (16) 

 Relying on this Court's earlier opinion reversing the receivership, the Fortenberrys
contend that the law of the case precluded the district court from appointing a receiver because, to
support the appointment of a receiver under article 7.05(A)(1), the district court also had to find that
"all other remedies available either at law or in equity" are inadequate. See id. art. 7.05(A). They
argue that, as was the case when the interlocutory appeal was before this Court, there remains "no
evidence of imminent danger of insolvency or other emergency justifying the appointment of a
receiver." See Fortenberry, 2005 Tex. App. LEXIS 4665, at *10. "The 'law of the case doctrine'
is defined as that principle under which questions of law decided on appeal to a court of last resort
will govern the case throughout its subsequent stages." Hudson v. Wakefield, 711 S.W.2d 628, 630
(Tex. 1986).

 The law of the case doctrine is inapplicable. When the interlocutory appeal was
before this Court, this Court held that the district court "abused its discretion in prematurely ordering
the appointment of a receiver with sweeping powers." See Fortenberry, 2005 Tex. App. LEXIS
4665, at *10. At that time, this Court found the appointment premature as there was the possibility
that the resolution of the parties' declaratory actions and monetary and injunctive relief would be
adequate remedies; this Court did not reach the "specific instances in which a receiver may be
appointed," concluding that the Cavanaughs failed to demonstrate that other available remedies were
inadequate at that time. Id. at *8, 10. At this juncture, the district court's declarations do not resolve
the deadlocks between the shareholders or the directors and, based on Fortenberry's actions during
the pendency of this case, the district court could have found that monetary and injunctive relief
would be inadequate. This Court's prior ruling did not preclude the district court from appointing
a receiver at some point in the future. 


Contempt


 In their fifth issue, the Fortenberrys contend that the contempt order is "void as it
exceeds the $500 maximum monetary penalty for contempt as set forth in section 21.002" of the
government code. See Tex. Gov't Code Ann. § 21.002(b) (West 2004). (17) 

 As a preliminary matter, the Cavanaughs contend that this Court lacks jurisdiction
to consider the contempt order because contempt orders are not directly appealable. See Ex parte
Williams, 690 S.W.2d 243, 243 n.1 (Tex. 1985) (decisions in contempt proceedings "can be attacked
only collaterally"); Metzger v. Sebek, 892 S.W.2d 20, 54-55 (Tex. App.--Houston [1st Dist.] 1994,
no writ) (appeal from contempt proceeding dismissed); Kidd v. Lance, 794 S.W.2d 586, 587 n.1
(Tex. App.--Austin 1990, orig. proceeding) (mandamus is the "only" available remedy to contempt
order where there is no order of confinement). The Fortenberrys respond that, because there is a
final judgment, there is no need to pursue the matter by writ of mandamus and that the filing of a
writ of mandamus is not a prerequisite to presenting the issue in an ordinary appeal. 

 We find the reasoning in Galtex Property Investors, Inc. v. City of Galveston,
113 S.W.3d 922 (Tex. App.--Houston [14th Dist.] 2003, no pet.), instructive. In that case, our sister
court considered the appellants' challenge to the contempt judgment on direct appeal, agreeing with
the appellants' argument that the "contempt judgment was not truly a contempt proceeding" and
should be recharacterized, to conclude that the "'judgment of contempt' was improperly
denominated as a contempt order." Id. at 926-27. The court found that "[t]he order was actually a
partial money judgment for civil penalties delineated in the agreed order." Id. at 927. In reaching
its ruling, the court noted that "[d]ecisions in contempt proceedings may not be reviewed by an
appellate court, even where a party seeks to appeal the contempt order along with a judgment that
is appealable." Id. The Fortenberrys have not argued that the contempt order was "improperly
denominated" a contempt order. See id. (18) We conclude that this Court lacks jurisdiction to review
the district court's contempt order in this appeal. (19)


CONCLUSION


 Because we conclude that this Court lacks jurisdiction to consider the contempt order
or Harper's initial appointment as the receiver for the company, we dismiss those portions of the
Fortenberrys' appeal that seek review of the contempt order and receivership for lack of jurisdiction. 
Because we conclude that the district court did not abuse its discretion in awarding attorney's fees
and costs in the amount of $747,037.84 to the Cavanaughs, that any errors in the district court's
questions and instructions to the jury were either waived or did not cause the rendition of an
improper verdict, and that the evidence was legally and factually sufficient to support the district
court's declarations, we overrule the Fortenberrys' remaining issues and affirm the district court's
judgment.

 

 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed in Part; Dismissed in Part 

Filed: November 26, 2008



1. Pending before this Court are the Cavanaughs' motion for leave to file sur-reply brief,
motion for leave to file post-argument response to appellants' citation of authority during argument,
and motion to strike sections II and IV of appellants' reply brief. We deny the motion to strike, we
deny the motion for leave to file sur-reply brief as moot, and we grant the motion for leave to file
post-argument response. Also pending before this Court is the Fortenberrys' motion for leave to file
post-submission brief and response to motion to strike. We grant the motion for leave.
2. In this opinion, we refer to appellant Roland D. Fortenberry, Jr., as "Fortenberry," and we
refer to his father Dale Fortenberry, Sr., as "Fortenberry, Sr." In addition, we refer to appellant
Kaye Ann Fortenberry as "Mrs. Fortenberry."
3. After the sale on August 1, 2000, Fortenberry owned 307 shares, Mrs. Fortenberry owned
178 shares, Cavanaugh owned 178 shares, and Mrs. Cavanaugh owned 307 shares. 
4. Harper has intervened in this appeal as the company's receiver and has filed briefs
addressing the Fortenberrys' issues concerning the receivership.
5. Absent a contractual or statutory basis, a trial court lacks authority to award attorney's fees
based upon a contempt finding. See Kennedy v. Kennedy, 125 S.W.3d 14, 19 n.4
(Tex. App.--Austin 2002, pet. denied); Equitable Trust Co. v. Lyle, 627 S.W.2d 824, 826
(Tex. App.--San Antonio 1982, writ ref'd n.r.e.). The plain language of articles 2.44(B) and (D)
and 5.14(j), however, authorize attorney's fees. See City of San Antonio v. City of Boerne, 111
S.W.3d 22, 25 (Tex. 2003). Pursuant to article 2.44(B), a court may award a director attorney's fees
that the court "deems just and proper." See Tex. Bus. Corp. Act Ann. art. 2.44(B) (West 2003). 
Article 2.44(D) provides that a corporation that refuses to allow a shareholder to examine the
corporate records "shall be liable to such shareholder for all costs and expenses, including attorneys'
fees." See id. art. 2.44(D) (West 2003). Similarly, article 5.14(j) authorizes a court to award
attorney's fees on "termination of a derivative proceeding." See id. art. 5.14(j) (West 2003). We
conclude that the trial court did not abuse its discretion in awarding attorney's fees pursuant to
the UDJA. 
6. The Cavanaughs also argue that a party does not have to substantially prevail to recover
fees under the UDJA. See, e.g., Barshop v. Medina County Underground Water Conservation Dist.,
925 S.W.2d 618, 637 (Tex. 1996) (fee award not dependent on finding that a party "substantially
prevailed"); G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc., 219 S.W.3d 37, 53-54
(Tex. App.--San Antonio 2006, no pet.) ("The Declaratory Judgment Act does not limit an award
of attorney's fees only to a prevailing party."). We need not address this additional argument
because we conclude that the Cavanaughs prevailed on their claim for declaratory relief.
7. The Cavanaughs deducted attorney's fees that they incurred in a separate matter concerning
Randy Fortenberry from the total amount in the billing records submitted to the district court. 
8. Prior to the district court's entry of the final judgment in February 2007, the parties filed
supplemental briefing on the issue of segregation of attorney's fees. The Fortenberrys argued in their
supplemental briefing that the Cavanaughs were required to segregate their attorney's fees pursuant
to Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 313-14 (Tex. 2006), which was released
by the supreme court shortly after the hearing on attorney's fees. In Chapa, the supreme court
modified and clarified the exception for segregation of fees, but the complaining party in that case
raised objection to the failure to segregate fees "during and after trial." Id. at 310. The Fortenberrys
contend that they were not required to object and have not argued that their supplemental briefing
to the district court preserved the issue for this Court's review. We, therefore, have not considered
the supplemental briefing in reaching our decision that the Fortenberrys failed to preserve this issue. 
9. The Cavanaughs' causes of action included claims for declaratory relief, breach of contract,
breach of fiduciary duties, an application for the appointment of a receiver, an action for an
accounting, and claims for temporary and permanent injunctive relief. 

10. The Cavanaughs contend that the Fortenberrys have waived their issues on the declaratory
judgment and the jury charge by inadequate briefing. See Tex. R. App. P. 38.1(h). To the extent the
Fortenberrys address particular declarations and jury charge questions and instructions, we conclude
that the Fortenberrys have not waived their complaints. 
11. Article 2.31(A) of the business corporation act provides that "the powers of a corporation
shall be exercised by or under the authority of, and the business and affairs of a corporation shall be
managed under the direction of, the board of directors of a corporation." Tex. Bus. Corp. Act Ann.
art. 2.31(A) (West 2003). 
12. The second sentence of section 5.07 also provides that unless authorized by the board of
directors, "no officer, agent, or employee shall have any power or authority to bind the corporation
by any contract or engagement or to pledge its credit or to render it liable pecuniarily for any purpose
or in any amount."
13. The Fortenberrys also cite Mr. Eddie, Inc. v. Ginsberg, 430 S.W.2d 5, 10 (Tex. Civ.
App.--Eastland 1968, writ ref'd n.r.e.), for the general rule that "the president of a corporation has
the authority to hire and discharge employees." The employee at issue in Ginsberg was not an
officer, and the president was also the principal shareholder. Id. at 7, 10. In contrast, the bylaws in
this case expressly authorize the board of directors to set terms of employment; Cavanaugh is the
vice president, a shareholder, and the chairman of the board; and Fortenberry is not the principal
shareholder.
14. In this case, Harper has been the receiver for Fortune Products for approximately two
years. 
15. At oral argument, the Fortenberrys' attorney acknowledged that there were no substantive
changes to the receivership in the final judgment. 
16. The district court, alternatively, could have found that a receiver should be appointed
pursuant to article 7.05(A)(1)(b) based on the directors' deadlock and the shareholders' inability to
break the deadlock or pursuant to section 64.001 of the civil practice and remedies code. See
Tex. Bus. Corp. Act Ann. art. 7.05(A)(1)(b) (West 2003); Tex. Civ. Prac. & Rem. Code
§ 64.001(a)(3), (6) (West 2008). Because we conclude that the district court did not abuse its
discretion in appointing a receiver pursuant to article 7.05(A)(1)(e), we need not address these
additional grounds.
17. Section 21.002(b) of the government code provides that "[t]he punishment for contempt
of a court other than a justice court or municipal court is a fine of not more than $500 or confinement
in the county jail for not more than six months, or both such a fine and confinement in jail." 
Tex. Gov't Code Ann. § 21.002(b) (West 2004). 
18. On appeal, at oral argument and in their post-submission briefing, the Fortenberrys argued
that the district court erred in ordering the penalty be paid to private parties. See Galtex Prop.
Investors, Inc. v. City of Galveston, 113 S.W.3d 922, 928 (Tex. App.--Houston [14th Dist.] 2003,
no pet.) ("The law is well established in Texas that a court may not award a civil judgment to a
private litigant in a contempt proceeding."). The Fortenberrys have not preserved this argument for
our review. See Tex. R. App. P. 38.1, 38.3; Dallas Co. v. Gonzales, 183 S.W.3d 94, 104
(Tex. App.--Dallas 2006, pet. denied) (rules of appellate procedure do not allow an appellant to
raise new issue in reply brief); Howell v. Tex. Workers' Comp. Comm'n, 143 S.W.3d 416, 439
(Tex. App.--Austin 2004, pet. denied) (same). 
19. To the extent the Fortenberrys raise new issues in their reply brief, they have not preserved
these issues for this Court's review. See Tex. R. App. P. 38.1, 38.3; Howell, 143 S.W.3d at 439. 
The Fortenberrys complain that the trial court erred in granting permanent injunctive relief in the
final judgment and that Harper personally does not meet statutory qualifications to serve as a
receiver.